**1442**

Carolyn K. METZGER, Plaintiff,

v.

Otis BOWEN, Secretary of the Department of Health and Human Services, Defendants.

No. CV86–L–794.

United States District Court,
D. Nebraska.

Aug. 4, 1987.

Harvey G. Froscheiser of Bailey, Polsky, Cada, Todd & Cope, Lincoln, Neb. and Charles J. Bentjen, Lexington, Neb., for plaintiff.

Steven Russell, Asst. U.S. Atty., Lincoln, Neb. and Yvonne M. Ernzen, Asst. Regional Counsel, and Paul P. Cacioppo, Chief Counsel, Region VII, Dept. of Health and Human Services, Kansas City, Mo., for defendants.

URBOM, District Judge.

On May 8, 1986, the administrative law judge denied the plaintiff's application for disability insurance benefits under the Social Security Act. The Appeals Council declined to review the decision after evaluating additional proffered evidence. Thus, the decision of the administrative law judge is the final decision of the Secretary and is reviewable by this court.

The review of this case is limited to the issues and evidence relevant to the plaintiff's condition on or before June 30, 1981.

I.

The decision of the administrative law judge must be affirmed if it is supported by substantial evidence in the record as a whole. *McMillian v. Schweiker*, 697 F.2d

215, 220 (8th Cir.1983). Substantial evidence is that amount of relevant evidence a reasonable mind might accept as adequate to support a conclusion after considering whatever fairly detracts from the evidence. *Bogard v. Heckler,* 763 F.2d 361, 363 (8th Cir.1985).

## II.

At the time of the hearing the plaintiff was a twenty-five-year-old woman with a twelfth grade education. The plaintiff has performed no substantial gainful work activity since January 1, 1981. The plaintiff's past work experience includes positions as a cook, nurse's aide, and production line worker. The administrative law judge determined the plaintiff capable of performing her post relevant work because her medical impairments did not preclude her from engaging in a full range of light or sedentary occupations.

## III.

The plaintiff testified that she was afflicted with a pituitary tumor which was discovered and removed in December, 1981. Prior to the removal of the tumor, the plaintiff stated that she experienced frequent and severe headaches, nausea, vomiting, and blurred peripheral vision. Additionally, the plaintiff testified that she suffered from depression because she "couldn't understand why this [had] happened to [her]."

The transcript indicates that:

"Q. And now, what symptoms were you experiencing and how long were you experiencing them before this tumor was discovered? What was happening?

A. Well, in January of '81 very severe headaches.

Q. O'kay, how often and how frequently?

A. Daily.

Q. Were you working then?

A. No, sir ...

Q. Go on.

A. And I was constant vomitting [sic] and I had eye—problems with my eyes. Basically my right eye.

Q. What was wrong with it?

A. Well, it was—I was seeing spots in my eyes and the peripheral vision of my right eye was going black ...

Q. And what happened after that?

A. Well, this went on for until around April ...

Q. O'kay, go on.

A. And my right eye just gradually seemed to get worse. The headache kind of, well they weren't as often for a period of time, and then—

Q. They got better, you mean?

A. Well, they did not necessarily get better. They just didn't get—they weren't as often ...

Q. O'kay, and about in April, how far apart were they?

A. Oh, I was about one every or two or three a day. Maybe one a day and maybe not any for a day.

Q. One a day and then you would skip a day or so and then—

A. Yes.

Q. —another one.

A. Yes. They were constant. In that period of time there were always headaches, but the first three months of my pregnancy it was daily. I was having headaches.

Q. Yes, that is what I understand they were daily headaches until April and then they got a little better then.

A. It got a little better.

Q. O'kay, go on.

A. In June it was better, yet I still had the problem with my vision and—

Q. O'kay go on.

A. —July it started up again, or I was having more frequent headaches. And then in August the baby was born and then from the time the baby was born until the middle of September it was good. I didn't have a lot of headaches. Then after September until they took out the tumor it was real bad. I had a lot of headaches and my eye went completely black by that time.

Q. O'kay so then in September of '81 until the surgery in December of '81 you

had constant headaches, is that what you are telling me?

A. Yes.

Q. And your vision finally went completely out in your right eye?

A. Half of my right eye. Just half of it.

Q. O'kay. Which half?

A. The right half. This half."

In response to questions posed by her attorney, the plaintiff testified as follows:

"Q. When did the—going back a little bit on what the judge already covered, when did you first begin to have symptoms of a serious—which you might consider a serious nature in connection with your pituitary?

A. In January of '81 I got real sick and headaches, vomitting [sic], my eyes were getting bad. They are real sensitive to light.

Q. Were these headaches on a daily basis?

A. Yes, sir.

Q. How long might they last?

A. Three or four hours.

Q. Would they occur at different times of the day?

A. Yes, sir.

Q. By that I mean might you have—would you have more than one headache a day?

A. Yes, sir.

Q. Were there any days when you—when you had none?

A. Not at that time, no.

Q. Did movement or activities, would that have any effect upon it?

A. Yes, sir.

Q. In what way?

A. Well, if I moved around, I would get a headache and I would start throwing up and my eyes would start bothering me real bad.

Q. Did you ever have pain in your eyes.

A. Oh, yes, sir.

Q. And what was that from?

A. Light—sensitive to light. I would lay in bed and I was to keep something over my eyes, and I would put some real dark curtains over the windows so no light could come in.

Q. Was that a problem—I should say, when was that a problem?

A. Oh, from January until about the first of April. It was really bad then and then later on during the summer it was just as bad, and I wore glasses inside grocery stores and outside. And anytime I had to go somewhere I had to wear dark sunglasses because of the sensitive to my eyes.

Q. Were—would these headaches ever arouse you from sleep?

A. Yes, sir. I might be sleeping and the headache would wake me up and I would throw up. Every time I had a headache, I would throw up ...

Q. And were anything—any prescriptions or medications given to you at that time for your headache?

A. They gave me a suppository.

Q. For a headache?

A. For a headache.

Q. Was that effective?

A. No. Nothing was. They told me I could take Tylenol and that didn't help."

The plaintiff testified, in response to her attorney's inquiry regarding how the headaches affected her, that:

"A. No. When I had a headache, I was out all day. I couldn't function.

Q. What do you mean out?

A. I would go and lay down and I wasn't going to get up until, you know, tomorrow because I was afraid of them. They were very hard to handle, and they hurt really bad. And so I didn't do anything. I didn't think about anything. I just laid there."

In response to inquiries of the administrative law judge, the plaintiff testified as follows regarding her depression:

"Q. O'kay, now, any other residual problems from this surgery at all? Any problems with memory, concentration, things like that?

A. Yes, I have some problems with concentration.

Q. Since the surgery?

A. Yes, basically since the surgery.

Q. Okay. Any other type of residual problems?

A. Mentally I guess.

Q. What problems there now?

A. Well, facing the problem.

Q. You have a problem with say depression or coping?

A. Depression, yes.

Q. Have you been under treatment for this?

A. Yes with Dr. Chasen [sic].

Q. Chasen [sic], yes. And how long have you been under treatment there?

A. Since January of '84."

The plaintiff testified that as a result of the tumor her body changed in the following manner after 1978: voice deepened; weight increased from 130 pounds to 207 pounds; foot size increased from 9B to 10½D; dress size increased from 13 to 18; chin, jaw, forehead, and nose increased in size; hands increased in size and her ring finger increased froms ize 8 to size 11; and breasts decreased in size from C to A.

The plaintiff indicated that she is capable of sitting, walking, and standing without difficulty. She does "some" cooking, but her husband does the majority of the housework. The plaintiff stated she engages in no recreational or social activities. The plaintiff testified that "taking care of [her child] and the household ... takes up [her] time...."

The plaintiff's husband, Charles Metzger, testified that he does most of the housework, lifting, and carrying for his wife. Metzger stated that when they were first married in 1978 they were "always on the go" and now they "just don't go anywhere." Metzger testified that his wife experiences fainting spells and memory difficulties. Metzger also described his wife as outgoing and friendly prior to the onset of the tumor, now she is a "homebodied kind of person" who prefers to be left alone.

## IV.

In her deposition testimony the plaintiff indicated that her headaches began about June, 1979. The headaches lasted from thirty to sixty minutes and occurred about twice a week. The plaintiff took Tylenol for the headaches and the Tylenol alleviated the pain. Also, during this time the plaintiff experienced spots in her right eye, soreness in her breasts, and lactation from her breasts.

The plaintiff stated that in her first visit to Dr. Hussain on December 20, 1979, she informed the doctor that she had been unable to conceive, she "wasn't having periods", and she wanted to know if she was pregnant. Additionally, the plaintiff indicated that she told Dr. Hussain that her breasts were sore, she experienced lactation from her breasts, and she suffered from headaches and spots in her eyes.

The plaintiff stated that in her visit to Dr. Hussain in September, 1980, she underwent a physical examination and infertility tests. The plaintiff also indicated that she told Dr. Hussain that she continued to suffer from the same ailments she described on December 20, 1979. In addition, the plaintiff stated that she informed Dr. Hussain that she was losing her hair and sweating.

During her medical visit in approximately late September or early October the plaintiff stated that she was prescribed Provera and Clomid. The plaintiff's menses began shortly after taking the prescribed drugs. In December, the plaintiff visited with Dr. Hussain and a urine and blood specimen were taken. Subsequently, the plaintiff was called and informed that the test results showed that she was pregnant.

The plaintiff stated that in January, 1981, she felt "terrible". The plaintiff indicated that her breasts were sore, she experienced lactation from her breasts, and suffered from headaches that lasted "all day long". The plaintiff stated that she called her physician about the headaches prior to her first prenatal care check-up in January, 1981. The plaintiff indicated that Dr. Hussain told her to take Tylenol. At some point, Dr. Hussain prescribed a suppository for the headaches. Upon informing Dr. Hussain that the suppository afforded her no relief, the plaintiff stated that she was

prescribed Benedectine, a morning sickness medicine.

The plaintiff indicated that during the prenatal examination of January 20, 1981, that:

"Q. All right. Let's stop for a moment. When you say they took your weight and blood pressure, visited with you as to how you've been and giving you material, would that be the nurses and the staff?

A. Yes, the nurses.

Q. Would you—would they have a chart and be writing on it as they did this?

A. Yes.

Q. When they asked you how you were, you would tell them, wouldn't you?

A. Yes.

Q. And you'd report to them how you were feeling?

A. Yes.

Q. What did you tell them with respect to your condition at that first meeting?

A. I told them I'd been very sick. I'd been having the headaches and had been hurting in my eyes. I couldn't see very well. The light hurt my eyes when I'd have these headaches. And it was all I could do to get up just to go to the bathroom because I'd been so sick.

Q. Did they respond anything to you?

A. No. They told me that it's part of pregnancy.

Q. Would they be writing these things down?

A. Yes.

Q. At least to you it looked like they were, anyway?

A. Yeah."

The plaintiff also stated that following the physical examination by Dr. Hussain on January 20, 1981, the plaintiff informed the doctor that she suffered from the same ailments she had previously relayed to the nurse. Moreover, the plaintiff indicated that:

"Q. Do you recall exactly what you may have told her about the headaches and the eyes?

A. Well, I'd been calling in to her every day or every other day and told her that the headaches were getting worse, and it was harder to see, and, you know, there was the spots before my eyes. She told me it was just a part of pregnancy."

The plaintiff stated that she continued to call Dr. Hussain regarding her headaches between January and February. The plaintiff revealed the following concerning her examination in February, 1981:

"Q. Did you relate any condition or symptoms to them as to how you were feeling?

A. Well, I'd been calling in, and they knew that I still had the headaches and I was still really sick.

Q. Did you have any nausea or anything like that?

A. Yes, all the time ...

Q. How long was it that you had this nausea?

A. Oh, from about the first of January.

Q. Until when?

A. Middle of March."

The plaintiff indicated that she continued to call Dr. Hussain concerning "headaches, and the nausea and vomiting and everything" between her February, 1981, and March, 1981, prenatal examination. The March, April, and May examinations were routine. In May, the plaintiff learned that Dr. Hussain was leaving to pursue her medical practice outside the state of Wyoming.

The plaintiff stated that she was examined by Dr. Kalke in June, 1981. During this visit the plaintiff informed the doctor that she "wished [she] wouldn't have gotten pregnant in the summer because [her] feet were so big." The plaintiff relayed no other complaints.

During the months of July and August, the plaintiff stated that she discussed her headaches and acne with Dr. Kalke. The plaintiff stated that Dr. Kalke informed her that such conditions were "a part of pregnancy". The plaintiff also visited with Dr. Kalke in her post partum examination which occurred six weeks after the birth of her child. The plaintiff stated that she again informed the doctor of her headaches.

The deposition testimony of Charles Metzger indicates that the headaches began in the summer of 1979. Metzger stated that during the first three months of his wife's pregnancy:

"I recall the severity of the headaches, completely incapacitate her ... But she lay in bed, and I'd have to get a cold washrag and put on her forehead and keep all the curtains drawn in the bedroom because of the intensity of the light just hurt her her eyes and her head ...

Q. How long did this type of situation exist where she was in the room and the lights were off and the curtains pulled?

A. It would last for periods of a week or week and a half or better. There's a lot of times she never even got out of bed. In fact, very rarely did she get out of bed."

Metzger also indicated that during those first three months of his wife's pregnancy he would call Dr. Hussain's office and inform the nurse of the severe headaches his wife was experiencing. Metzger was told by the nurse that she would inform the doctor of his call. The nurse would return his call and suggest that he give his wife aspirin and apply a cold washrag to her forehead.

The deposition testimony of Brenda Adams, a friend of the plaintiff's, indicates that in February of 1981 the plaintiff suffered a severe headache while at the Adams home which required the plaintiff's husband to take her home. Adams also stated that the plaintiff complained to her of headaches.

The deposition testimony of Dr. Hussain, specialist in gynecology and obstetrics and plaintiff's treating physician, indicates that prenatal care medical records are distinguishable from the staff notes taken of a patient. The purpose of the staff notes is to keep a record of the condition of the patient and each healthcare provider with whom the patient comes into contact records the encounter. Dr. Hussain writes such notes at the time she talks to the patient. The prenatal care record is different in that a patient is specifically questioned and examined for certain symptoms. These symptoms are noted only on the prenatal care record. The prenatal care record includes a preprinted chart which lists such symptoms as headaches, dizziness, nausea, and vomiting.

In interpreting the first staff notes entry, dated December 20, 1979, regarding the plaintiff, Dr. Hussain stated:

"Q. And is that writing your writing?

A. Part of it, yes. Most of it. Part of it is by a nurse.

Q. What part of it is by a nurse?

A. The first two lines, three lines.

Q. What is it that the nurse probably did? What did she record?

A. She took the patient's basic height, weight, age, blood pressure, vital signs, and whatever the patient told her that her problem was.

Q. And whatever what?

A. The main problem for which the patient came to see us.

Q. Is that the CC on there, chief complaint on there?

A. Yes, chief complaint.

Q. What is that?

A. The patient thought she was pregnant, but she was not sure."

Dr. Hussain stated that the staff notes indicate that during the plaintiff's initial visit on December 20, 1979, the plaintiff informed Dr. Hussain that she thought she might be pregnant. Dr. Hussain stated that the plaintiff was given a complete physical examination and the medical notes indicate that all findings were normal. The breast examination included checking for discharge from the nipples, lumps, and tenderness. Dr. Hussain indicated that the plaintiff did not inform Dr. Hussain of her past irregular menses, but did mention that she had had a previous miscarriage.

Dr. Hussain stated that, according to the staff notes, during an examination in early September, 1980, the plaintiff complained only of a problem with her menses. At that time, the plaintiff denied any breast pain, nausea, or vomiting and "[a]ll findings were normal." On September 22, 1980, a pregnancy test was performed. On October 10, 1980, the plaintiff was pre-

scribed Provera to start her menses. On October 20, 1980, the plaintiff was prescribed Clomid. The plaintiff called on November 19, 1980, to inform Dr. Hussain that her period started. On December 23, 1980, the plaintiff visited the doctor and Dr. Hussain suspected the plaintiff was pregnant. A pregnancy test confirmed the diagnosis the next day.

Dr. Hussain stated that the "facing sheet" of the prenatal record, dated January 20, 1981, indicates that the plaintiff experienced headaches since her last menstrual period which occurred, according to Dr. Hussain, on November 18, 1980. Dr. Hussain stated that the prenatal examination notes indicate that on January 20, 1981, the plaintiff complained only of nausea and vomiting. The deposition reveals:

"Q. Is it your policy to go—when she comes in, to go right through those symptoms that are listed on there?
A. Yes.
Q. So she listed she had no headache; is that correct?
A. Right ...
Q. For that particular moment at that time? 'Are you having a headache now?' 'Are you nauseous now?' Is that it?
A. It's not at the minute. But if she had any, like from the last visit, I can say, 'From the last visit, did you have any problem?' because this is done on a regular visit."

The prenatal charts, as interpreted by Dr. Hussain, indicate that on January 22, 1981, the plaintiff called to say that she had a headache and Compazine, a suppository, was prescribed. On January 26, 1981, the plaintiff called and informed the nurse that she was experiencing nausea and vomiting. The plaintiff was prescribed Benedictine. During the examination of February 17, 1981, the plaintiff responded negatively when questioned as to whether she experienced any headaches, dizziness, and swelling. The plaintiff did complain of nausea and vomiting.

Dr. Hussain stated that on March 17, 1981, the plaintiff complained only of nausea and vomiting. In the examination of April 14, 1981, the plaintiff denied that she

was suffering from any ailments and the nausea and vomiting were gone. The plaintiff also visited with Dr. Hussain on May 12, 1981.

The deposition of Dr. Hein Kalke, specialist in obstetrics and the plaintiff's treating physician, indicates that he first met the plaintiff on April 22, 1981. At that time, the plaintiff's complaints were abdominal cramping and fatigue. During his examination of the plaintiff on June 9, 1981, Dr. Kalke stated that:

"From the records, she stated that she had occasional cramping, that she had no bleeding, she denied any headaches, dizziness, swelling of her extremities. She had some nausea vomiting."

Dr. Kalke stated that on June 30, 1981, the plaintiff "had no complaints except for occasional nausea." On July 18, 1981, the plaintiff complained of cramping in her left leg. Moreover,

"[a]t that time she did not reveal that she had any headaches, dizziness, swelling of her extremities, nausea, vomiting or bleeding."

Dr. Kalke stated that on July 20, 1981, the plaintiff complained of "some headaches and dizziness, but her main complaint was a clear white fluid from her vagina and the baby being much less active." Between July 20, 1981, and July 25, 1981, the plaintiff was hospitalized for premature labor. On July 28, 1981, the plaintiff "denied any headaches, dizziness, swelling of the extremities, nausea, vomiting, or bleeding."

On August 4, 1981, the plaintiff had some nausea and vomiting, but no other symptoms. The plaintiff called the doctor's office on August 6, 1981, and her prescription for Breathine, a drug which counteracts premature contractions, was refilled. Dr. Kalke stated that on August 12, the plaintiff experienced some nausea and vomiting, but no other symptoms were noted. On August 17, the plaintiff had some dizziness and nausea, but no headaches. Subsequently, the plaintiff gave birth to a baby girl. Dr. Kalke examined the plaintiff six weeks later for a routine

post partum checkup. At that time, the plaintiff "really had no complaints."

The deposition testimony also reflects: "Q. Doctor, let me ask you, when a patient volunteers information, is it possible that you don't write down everything that the patient volunteers?
A. It's possible; unlikely, though."

The deposition testimony of Dr. A.S. Annin, specialist in internal medicine, indicates that he first examined the plaintiff on December 21, 1981. Dr. Annin stated that the plaintiff, at that time, was complaining of headache and change in vision. In addition, the deposition shows:

"Q. All right. Doctor, you did not see Mrs. Metzger in 1979 or in 1980 or in 1981 until the month of December, isn't that correct?
A. That is correct.
Q. What may have been the situation in 1978, 1979, 1980, you must look at by way of hindsight as related to you by information provided to you, isn't that correct?
A. That is correct."

The deposition testimony of Dr. Robert Luby, specialist in gynecology and obstetrics who was serving as a medical witness, indicates that he believes that had Dr. Hussain followed the standard of medical care exercised by licensed physicians specializing in gynecology and obstetrics that Dr. Hussain would have detected the pituitary tumor. The transcript indicates that:

"A. There was sufficient historical information as well as laboratory findings to suggest strongly the presence of a pituitary tumor ...
Q. Before we get in general ideas or general thoughts I noticed in the last statement you gave you talked about sufficient historical information as part of the reason and justification for the opinion stated by you?
A. Correct.
Q. When you use the term historical information are you talking about the records as revealed by the clinic in Gillette or are you including in that what plaintiff here told you during your visit with her on the 14th of last November?

A. I'm including what plaintiff told me and also her deposition.
Q. All right.
A. And her husband's deposition.
Q. Those are important additional factors, are they not?
A. They are.
Q. And the symptoms and conditions she related to you in her deposition, by way of her deposition and also in person to you, are in addition to and certainly contain more detail than the medical information developed in one fashion or another by Doctor Hussain in 1979 and 1980.
A. That's correct"

The deposition testimony of Dr. Eli Chesen, plaintiff's psychiatrist, indicates that the plaintiff was first treated for depression on December 30, 1983. During this first session, the plaintiff and her husband "described symptoms of depression that had been increasing over the past several months, accompanied by a tendency to wake up a great deal at night. That had been going on for six months prior to my examination."

### V.

The medical evidence is as follows:

The staff notes of the Dr. Hussain indicate that the patient first visited on December 20, 1979. The notes do not appear to reflect any complaints of headaches, nausea, or vomiting from December 20, 1979, through September 29, 1981. The notes do show that on December 20, 1979 and September 11, 1980, that Dr. Hussain listed such various parts of the body as the breasts, eyes, ENT, etc., and a check mark appears next to each. (Tr. 196–201).

The "facing sheet" of the prenatal records shows that on January 20, 1981, positive notations were made under "History Since Last Menstrual Period" for nausea, vomiting, and headache. Under the physical examination section, a check mark appears next to eyes, abdomen, extremities, breasts, and nipples. (Tr. 202–203).

The preprinted charts of the prenatal records indicate the following: On January 20, 1981, nausea and vomiting were positively noted, but headache was not checked. On January 22, 1981, a notation reads "bad headache" and it appears that a prescription follows the notation. On January 26, 1981, it appears that a prescription is noted. On February 17, 1981, and March 17, 1981, nausea and vomiting are positively noted, but headache is not checked. On April 14, 1981, neither nausea, vomiting, or headache were positively noted. On April 22, 1981, dizziness and nausea were noted.

On May 12, 1981, no relevant symptoms were noted. On June 9, 1981, nausea and vomiting were noted. No relevant symptoms were positively noted for June 30, 1981, or July 18, 1981. On July 20, 1981, headache and dizziness were noted. On July 28, 1981, no relevant symptoms were noted. On August 6, 1981, vomiting was noted. On August 8, 1981, a prescription was refilled. On August 12, 1981, nausea and vomiting was noted. On August 17, 1981, dizziness and nausea were noted. (Tr. 204–207).

On December 20, 1981, Dr. R.F. Statton, specialist in opthalmology, noted that:

"This patient was first examined in my office on 12/19. She gave the following history[.] For the past several weeks she has been troubled with headaches of increasing intensity. She has also become aware of a loss of vision, especially in her right field of gaze. In the last week or so vision has deteriorated in both eyes interfering with reading, etc...." (Tr. 308).

Dr. L.J. Gogela, indicated on approximately December 20, 1981, that:

"Extreme headaches—Week +. Some headache for about year. Frontal and occipital. 'Pressure' and 'throbbing'. More headache lying down and with exertion. Nauseated. Stomach pain and vomits and more headaches. Sleep impaired.

Vision impaired to the right. "Can't focus"—about month +. Onset gradual." (Tr. 312).

On December 21, 1981, the plaintiff was admitted to the hospital due to headaches and visual loss. Dr. A.S. Annin noted at the time of the plaintiff's admittance that:

"Indeed the patient has had some headache and change in vision over the last several months period of time, but this seems somewhat worse these last few weeks.

[T]here has been some upset stomach, intermittent nausea with some vomiting." (Tr. 177–178).

On December 22, 1981, a pituitary tumor was removed from the plaintiff. Dr. B.R. Gelber, specialist in neurological surgery, noted that:

"This 21 year old female noted gradual onset of visual difficulty and headache. She also has noted increase in her glove and shoe size over the last several years ..." (Tr. 180).

In a letter dated June 5, 1984, Dr. Statton stated:

"I saw Mrs. Metzger for the first time on December 19, 1981. She stated that for the past week she had had increasingly blurred vision, especially in the right eye. She was unable to see off to the right side at all. She also had severe headaches and was taking aspirin for these without much relief. She had increasing difficulty with sensitivity to light in both eyes ... (Tr. 213).

In a letter dated May 29, 1985, Dr. Statton stated:

"With regard to the on set of her disability, my records show that in December of 1981, she was in rather dire straits with devastating headaches, blurred vision, photophobia and finally nausea and vomiting. All these symptoms are consistent with the pituitary tumor found at surgery. Such a large tumor would take several months to develop so that her disability would have begun early in 1981." (Tr. 868).

In a letter dated August 16, 1985, Dr. Eli S. Chesen, psychiatrist, stated:

"I am writing with regard to your letter of August 14th in which you included information regarding Carolyn Metzger

which reflects her symptomatology from the summer of 1979 through 1983.

Assuming all the information is accurate, it would appear that Carolyn has been significantly disabled since the summer of 1979 and completely disabled since the onset of her pregnancy in late 1980." (Tr. 861).

The information provided to Dr. Chesen, by the plaintiff's attorney, included the following:

"During the summer of 1979, Carolyn Metzger began experiencing infrequent menstrual periods, weight gain, severe headaches, spots before her eyes, and sore breasts and a breast discharge. These symptoms, with headaches occasionally severe enough to confine her to bed, continued through 1980. Additional symptoms of her disease occurred in 1980, including loss of hair, body odor, acne and excessive perspiration.

After becoming pregnant in December 1980, Carolyn's headaches became much more severe, occurred more frequently, and incapacitated her for days at a time. She also suffered nausea, vomitting [sic], and eye pain on exposure to natural or artificial light. These symptoms continued throughout her pregnancy and continued after her daughter[']s birth (August 19, 1981) until the time of her surgery in December 1981. Physically Carolyn experienced a growth in her hands and fingers beginning in November 1980, growth in her feet which she became aware of in April 1981, and enlargement of her jaw, tongue and lips, which she realized in August 1981." (Tr. 863).

In a letter dated August 23, 1985, Dr. Asher stated:

"Although it is not possible to totally prove, I think it is very likely that her symptoms during the pregnancy were related to the pituitary tumor. This would be consistent with an onset of difficulties in early 1981." (Tr. 856).

In a letter dated August 29, 1985, Dr. Annin stated:

"I had the opportunity to again examine and visit with Mrs. Metzger on 8/21/85. It has now been four years since she was pregnant and at which point she developed problems with dysmenorrhea and headaches.

Indeed she would remind me that prior to her becoming pregnant she was having problems with irregular menstruation and even a measure of headaches. Of course, throughout the year of her pregnancy these became much more intense subsequent to this." (Tr. 855).

## VI.

The plaintiff contends that the administrative law judge erroneously discredited the plaintiff's subjective complaints. The plaintiff argues that:

"[I]t is clear that [the administrative law judge] reached his findings relying exclusively on what he believed were inconsistencies between Mrs. Metzger's subjective complaints of pain and the objective medical evidence relating to Mrs. Metzger's illness as reported by her Wyoming doctors. Further, in reaching his decision, the ALJ failed to consider all of the objective medical evidence, and instead relied solely on the findings of two physicians who at the time of Mrs. Metzger's Social Security application were being sued by Mrs. Metzger ... The ALJ, being fully appraised of the pending lawsuit did not question the credibility of the two physicians."

The Eighth Circuit Court of Appeals set forth the standards for evaluating subjective complaints of pain in *Polaski v. Heckler*, 751 F.2d 943 (1984), *vacated on other grounds*, —— U.S. ——, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986). The administrative law judge may not disregard subjective complaints of pain solely because the objective medical evidence does not fully support the claim. The absence of objective medical evidence is one factor to be considered with all of the evidence relevant to the plaintiff's subjective complaints, including the plaintiff's past work record and observations by third parties and physicians, which bear on (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effective-

ness and side effects of medication; and (5) functional restrictions. *Id.* at 948.

■ After recounting the plaintiff's testimony and the medical evidence of record, the administrative law judge resolved the issue of the plaintiff's credibility by determining that inconsistencies in the evidence as a whole existed. The administrative law judge determined that:

"The next inquiry is whether Claimant was capable of performing her past work on or before June 30, 1981. On this point, the record shows that, on or before June 30, 1981, the Claimant was treated for occasional nausea and vomiting, abdominal cramping, fatigue and a brief period of headaches. It is apparent that Dr. Hussain and Dr. Kalke, her treating physicians at the relevant time, attributed these symptoms to the Claimant's pregnancy; however, even if (as indicated by physicians who have since examined her) her pituitary tumor was a contributing factor at that time, *the proper focus of this inquiry is what, if any, effect did her symptoms have on her ability to function prior to June 30, 1981.*

There is evidence in the record that the symptoms alleged could be caused by the pregnancy or the tumor. Logically, it could be (and probably was) a combination of both. The etiology of the complaints is in conflict but, as noted, the focus in cases like this is the effect of the symptoms on one's ability to accomplish work related functions such as sitting, standing, walking, lifting, thinking, communicating, etc...

[T]he undersigned, pursuant to the rules of *Polaski,* gives full consideration to all the evidence in making his credibility determination regarding Claimant's subjective complaints. An examination of Claimant's work record is not extremely helpful. Such shows only intermittent work with no real earnings after 1979 ... Next, third parties and treating and examining doctors have made many observations and statements regarding Claimant's activities, the duration and intensity of her pain, aggravating factors,

medications, etc. There is significant conflict in Claimant's testimony and the reports of her treating doctors concerning the duration, frequency and intensity of her headaches etc., during the relevant period of time ...

[T]he evidence as to Claimant's complaints of incapacitating headaches is in irreconcilable conflict with other parts of the record. She claims continuing pain and that she reported such to her doctors. Her doctors testified, for the most part, that she reported no headaches or incapacitating discomfort at monthly appointments from January to August, 1981. This was true even when specific inquiries regarding headaches were made. Claimant's testimony is certainly inconsistent with the record in this regard.

After studying the testimony and the record as a whole, the undersigned concludes that Claimant's testimony regarding her incapacitating headaches, nausea, etc. is not entitled to controlling weight and consideration. In must be discounted. The reasons for this conclusion are generally as follows. *First,* the testimony by deposition of the treating doctors (Hussain and Kalke) is supported by written records made by them contemporaneous with the events. There appears to be no reason for the treating doctors to not document whatever complaint was made. Headaches, when they did occur, were mentioned, were documented, and medication prescribed. If more complaints of headaches had been made, it is logical that such would have been documented at the relevant time. No reason appears why such would not have been done. The probability that it would have been so documented and treated by the doctors (at the relevant time) is great. No reason appears to suggest that such was not the case. No lawsuits had been filed at that time and the Claimant was a patient of the doctors. Claimant's testimony as to the frequency and duration of her headaches is clearly inconsistent with the record. *Second,* when Claimant was hospitalized on December 21, 1981, she complained of headaches and visual loss

at hospitalization and noted it had occurred 'over the last several months period of time, but ... somewhat worse these last few weeks.' ... This is not entirely consistent with her testimony of incapacitating headaches and visual changes for nearly a year. *Third*, Dr. Statton reported that he saw Claimant on December 19, 1981 and she stated at that time that 'for the past week she had had increasingly blurred vision.' ... This statement by Claimant is not consistent with her allegations of severe vision problems (no driving, etc) for a year or more. *Fourth*, no significant pain medication was apparently prescribed by the doctors for Claimant during the relevant time ... Logically, it would appear to the undersigned, that if Claimant had made complaints of severe pain as she alleges—something else would have been prescribed or some other action taken by the doctors. The records show they were responsive the times recorded complaints of headache were made. *Fifth*, Claimant herself admits in one part of her deposition that when she saw Dr. Kalke (April, 1981) she still had headaches, but they were not a problem. She took 'over the counter' Tylenol and suppositories ... However, in the amended complaint she filed against the doctors, she alleged 'excruciating pain and debilitating headaches' sufficient to render her bedridden from January to May 1981 'and succeeding months'. The inconsistency is noted, not that such is important in and of itself (for many things are alleged in complaints) but only for cumulative effect. Also, Claimant's medications at relevant times herein were suppositories, over the counter Tylenol, medication for morning sickness, etc. There is no evidence of side effects and some evidence that the medications were helpful. All in all, such evidence is inconsistent with complaints of severe, continuous and incapacitating headaches. *Sixth*, with regard to functional limitations, there is evidence in the record from Claimant, her husband, and a friend that Claimant was severely restricted during relevant times. Be that as it may, she was evidently well enough to travel from Wyoming to Nebraska in December, 1981 ... There is also evidence that Claimant was somewhat socially active in early 1981 ... *Seventh*, while Claimant testified to emotional problems (depression) during the relevant period of time, there is no medical or other evidence indicating that such was a significant problem at that time. In part, Claimant's psychiatrist, testified by deposition that he first saw Claimant on December 30, 1983 and she then described symptoms of depression that had been increasing over the past several months. Problems with sleep and appetite had persisted for six months ... The doctor noted no history of psychiatric problems ... Thus, it is readily concluded from this evidence that Claimant had no determinable mental impairment during the relevant period of time (January to June 1981). Thus, based upon obvious inconsistencies between the Claimant's testimony and pertinent medical findings recorded at relevant times, and other inconsistencies and facts, it is found that, on or before June 30, 1981, the Claimant did not experience subjective symptomatology (headaches, vomiting blurry vision, etc.) in such intensity or of such frequency or duration as would have significantly limited her from performing basic work-related functions. In summary, the undersigned Administrative Law Judge finds the Claimant's testimony, insofar as it related disabling subjective complaints, not credible and, therefore, not entitled to significant weight and consideration ...

Finally, it is noted that several of Claimant's doctors have expressed the opinion that Claimant was 'disabled' in early 1981 or that her difficulties began in early 1981 or that she was disabled by her pregnancy in late 1980 ... Pregnancy is, of course, not a disabling medical impairment. Further, doctor's opinions concerning disability are helpful if supported by other medical evidence and consistent with relevant evidence. Here the doctors must logically base their opinions as to Claimant's disability main-

ly on her allegations. They must assume the credibility of her complaints. Here it has been determined that her testimony regarding subjective symptoms is not credible. Such being the case, little weight can be assigned to the doctor's opinions."

■ In disability determinations, credibility assessments are in the first instance for the administrative law judge. The reviewing court will not interpose its own judgment. Where proof of a disability depends upon a credibility determination, the administrative law judge may reject the plaintiff's testimony by expressly discrediting the subjective complaints and documenting some basis for the finding. *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir.1984). The existence of inconsistent evidence in the record is one basis for explicitly discrediting subjective allegations of pain.

The administrative law judge thoroughly and commendably evaluated the evidence of record, including the plaintiff's subjective complaints. Contrary to the plaintiff's contention, the administrative law judge did not fail to consider all the objective medical evidence. The administrative law judge found the plaintiff's testimony regarding her subjective complaints incredible. I am persuaded that the finding of the administrative law judge is supported by substantial evidence in the record as a whole.

## VII.

■ The plaintiff also argues that the Appeals Council erred in determining that the new evidence did not provide a sufficient basis to find the plaintiff disabled as of January 1, 1981. Confirmation of the administrative law judge's decision was not erroneous.

The additional evidence submitted to the appeals council subsists of the letter dated August 23, 1985, by Dr. Asher which I previously outlined and a letter dated September 10, 1986, by Dr. Annin which stated:

"Carolyn Metzger had seen me initially in December of 1981 when I had been asked to see the patient because of severe headache and clinical and radiographic changes consistent with a pituitary tumor ... The patient's history suggested to me that she had had acute headaches throughout much of 1981 with blurred vision, some nausea, and vomiting; all quite typical, I feel, with what one would expect with a chromophobe ademona or pituitary tumor. The patient had been pregnant during a part of this time, but I feel the pregnancy would not have explained the rather severe headaches she experienced.

I have felt that based upon the usual clinical course of these tumors and the patient's history, that the patient was unable to seek gainful employment during 1981 and that she for all practical purposes was disabled from January 1981 until this current time."

I am not persuaded that the additional evidence supports the plaintiff's contention that the plaintiff was disabled prior to June 30, 1981. Again, the findings set forth by the above physicians assumes the veracity of the plaintiff's subjective complaints. It has previously been determined that such complaints are not credible.

Accordingly, the decision of the Secretary is affirmed.